***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rowell and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award except for modifications made herein. Accordingly, the Full Commission affirms with modifications the Opinion and Award of Deputy Commissioner Rowell.
Plaintiff moved the Full Commission for attorney fees pursuant to N.C. Gen. Stat. § 97-88.1. The Full Commission finds that defendants' defense of this case was not without merit and therefore denies plaintiff's motion.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and after the hearing as:
 STIPULATIONS
1. A Pre-Trial Agreement was stipulated into evidence as Stipulated Exhibit #1, reciting:
a. The parties are subject to and bound by the provisions of the North Carolina Worker's Compensation Act.
b. Key Risk is the insurance carrier for the Employer.
c. On May 3, 1997, plaintiff was an active member of the North Carolina Army National Guard.
d. On May 3, 1997, plaintiff was attending annual training at Fort Bragg, NC, as part of her duty as a member of the North Carolina Army National Guard.
e. The North Carolina Army National Guard determined that plaintiff injured her back in the line of duty during the annual training.
f. Defendants have denied liability for plaintiff's workers' compensation claim.
g. If plaintiff is entitled to compensation, her compensation rate is the maximum, $512.00 per week, pursuant to N.C. Gen Stat. § 97-29.
2. The parties stipulated into evidence as Stipulated Exhibit #2, a medical records packet, which by agreement of the parties was submitted subsequent to the date of hearing before the Deputy Commissioner.
 RULINGS ON EVIDENTIARY MATTERS
Defendant's objection to any legal opinions or conclusions expressed by plaintiff's lay witness by deposition, Mr. Gene Dickey, is overruled.
The objections contained within the depositions of Dr. Keith Tucci and Dr. Charles Branch are ruled upon in accordance with the applicable law and the Opinion Award in this case.
 ***********
Based upon all the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 35 years old, had a high school education, and was attending Methodist College. On May 3, 1997, plaintiff was an active member of the North Carolina Army Reserve National Guard (the "Guard"). Plaintiff was otherwise unemployed on May 3, 1997, but for some time had been attending college courses at Sampson County Community College, James Sprunt Community College, and Methodist College. On May 3, 1997 plaintiff was attending annual training at Fort Bragg, North Carolina, as part of her duty as a member of the Guard. Before May 3, 1997, plaintiff had experienced no prior back problems, was the mother of four children, and was actively engaged in many activities.
2. On May 3, 1997, plaintiff was assigned to the Mess section for her annual training, which was responsible for preparation of food for all the troops in the field. Her duties included, among other things, digging ditches, unloading trucks, and lifting and carrying heavy items. These items ranged from ten to seventy-five pounds. Plaintiff had others performing these duties with her, but at times was the only person performing the duties. On May 3, 1997, plaintiff's first day of annual training, she finished her duties between 10:00 pm and midnight. The next morning, on Sunday, May 4, 1997, plaintiff got up between 2:30 and 3:00 a.m. and found her legs and back to be stiff and sore. Plaintiff continued her duties that day, and as the day progressed her back pain gradually grew worse. Plaintiff finished her duties between 10:00 p.m. and midnight. The next morning, on Monday, May 5, 1997, plaintiff got up about 2:30 a.m., and her back pain was to the point that she had to ask for help in putting on her shoes. Plaintiff performed her breakfast duties as best she could, and after breakfast was allowed to leave the annual training site to attend a class a Sampson County Community College. Plaintiff continued to have pain that night at class and returned to the training site. On the next two days, Tuesday and Wednesday, May 6 and 7, 1997, plaintiff kept the same routine but continued to experience back pain to where it hurt to move her legs.
3. On May 7, 1997, while plaintiff was attending class, her pain grew worse and her mother was called to meet her at the Duplin General Hospital emergency room. Plaintiff presented there with lower back pain and was diagnosed with acute lumbar strain. Plaintiff described that she had been lifting heavy equipment with the Guard since May 3, 1997. Plaintiff returned back to the training site and presented the May 7, 1997, doctor's note to her immediate supervisor, SFC King.
4. On May 9, 1997, plaintiff was sent to a MASH unit and examined by a Guard physician who determined that plaintiff had a lumbar sprain with right sciatica from heavy lifting. Plaintiff was put on bed rest. On May 11, 1997, plaintiff was allowed to leave the annual training site to attend her grandmother's funeral. Plaintiff did not return back to the annual training site prior to its completion on May 17, 1997.
5. On July 17, 1997, plaintiff presented at the Sampson Regional Medical Center Emergency Room with complaints of pain in her back running down to her legs and thighs. Plaintiff indicated that she had helped her husband lift a light sheet of tin approximately four days earlier, but reported ongoing back pain prior to such incident with her husband. She reported experiencing pain when squatting to help lift the sheet of tin.
6. On January 28, 1998, plaintiff again presented at Duplin General Hospital emergency room with lower back pain and right leg pain. Plaintiff reported that she had injured her back previously in May 1997.
7. On April 8, 1998, plaintiff presented once more at Duplin General Hospital emergency room with lower back pain radiating down to her legs. The April 8, 1998, medical note incorrectly stated that plaintiff had lifted a couch four to five days earlier, when plaintiff had actually pushed a T.V. with rollers on it.
8. On April 14, 1998, plaintiff was seen at Gateway Physicians Group with complaints of back pain, which had started in May 1997. These complaints of back pain had continued to worsen with pain going into her legs. Plaintiff reported problems with sitting and standing, and had pain shooting down to her hips to her knees. On April 15, 1998, an appointment was made for plaintiff to have an MRI of her back. On April 22, 1998, plaintiff was again seen and was still having a lot of pain in her back. She complained that the pain was going down her legs, that she was having difficulty lying down on her back, and that no pain medicine was helping her. On April 24, 1998, plaintiff underwent an MRI of the lumbar spine and was found to have a huge ruptured disc at L5-S 1 centrally with significant lumbar stenosis.
9. On April 24, 1998, plaintiff was seen at East Carolina Neurology concerning her severe back pain. It was determined that plaintiff was unable to carry out normal daily activities and was unable to walk secondary to her low back pain. It was also determined that plaintiff would be unable to work until her condition resolved.
10. On May 4, 1998, plaintiff was seen by Dr. Keith Tucci at Eastern Carolina Neurosurgical Associates, who recommended that plaintiff have surgery. On May 12, 1998, Dr. Tucci performed a L5 hemilaminectomy and L5-S 1 diskectomy. Following the surgery, plaintiff did well for a short period of time but the disc problems recurred in July 1998. Dr. Tucci performed surgery again on July 30, 1998, for a re-exploration of the disc space and for removal of the recurrent ruptured disc. Following this second surgery, plaintiff did well for a period of time until she had another occurrence of a ruptured disc at the same level and the same site. Following plaintiff's last recurrence, she was referred by Dr. Tucci to Dr. Charles Branch at Wake Forest University Baptist Medical Center.
11. Plaintiff was first seen by Dr. Branch on September 23, 1998. Dr. Branch suggested a third surgery in an effort to alleviate plaintiff's back and leg pain. On September 24, 1998, Dr. Branch performed a posterior laminectomy and interbody fusion with bone dowel for fusion of the L5-S 1.
12. On September 23, 1999, Dr. Branch determined that plaintiff was at maximum medical improvement and gave a permanent partial rating to her back of twenty percent (20%). Dr. Branch subsequently increased this rating to twenty-seven percent (27%).
13. On August 17, 1998, a determination was made by the Guard that plaintiff, during her annual training, had injured her back in the line of duty on May 3, 1997. In making this determination, no indication was given concerning whether any other injuries unrelated to plaintiff's May 13, 1997, injury had occurred since that day. Additionally, no other medical records were available except plaintiff's February 20, 1996, military physical record.
14. Effective October 31, 1999, plaintiff was given an honorable discharge from the Guard. The reason given for plaintiffs discharge was that she was determined to be medically unfit for retention.
15. Following May 3, 1997, and up to the time of plaintiff's discharge, on October 31, 1999, she had attended Guard drills. Following May 3, 1997, plaintiff continued to take college courses and was attending classes at Methodist College at the time of hearing before the Deputy Commissioner.
16. From May 7, 1997, through the date of the hearing before the Deputy Commissioner and continuing plaintiff was unable to earn wages due to her compensable disability.
17. Both Dr. Tucci and Dr. Branch were of the opinion, and the Full Commission finds as fact, that the initial injury which plaintiff sustained in May 1997 caused her to have the disc problems that led, as a natural consequence, to her subsequent surgeries.
18. Dr. Tucci testified that plaintiff, as a consequence of the three disc surgeries, now suffers from a "tremendous" amount of scarring that envelops the nerve root. This scarring poses a significant problem as it can cause irritation to the nerve root whenever plaintiff lifts, bends, or twists. According to Dr. Tucci, plaintiff is highly unlikely to find employment given her work restrictions. Plaintiff would need to seek sedentary work in a position in which she could take frequent breaks and miss work frequently due to her continuing pain. When asked as to the likelihood that plaintiff would improve enough to find work in the competitive job market, Dr. Tucci testified: "She has been through a lot and she has had a lot done to her back and I would say if I were a betting man I would not bet that Paula will ever find herself an adequate job." incident.
19. Dr. Branch, who also treated plaintiff, testified that plaintiff's L5 and S1 nerve roots have been "irritated in a chronic way." Dr. Branch additionally testified that plaintiff is probably not capable of holding a job that would require her to be present on a consistent basis, and stated:
 [T]he degree of discomfort that she is in and will likely experience is going to be have a significant impact on her capacity to function in a competitive job market. In fact, I think it actually precludes her functioning competitively in a job market.
20. Although plaintiff was determined to be at maximum medical improvement on September 23, 1999, the Full Commission finds the evidence of record supports that plaintiff continues to be disabled as a consequence of the May 3, 1997
21. On May 3, 1997, plaintiff sustained a specific traumatic incident of the work assigned, which resulted in lumbar strain, ruptured discs, chronic back pain, and pain radiating down her legs. All subsequent and medically documented events were aggravations of this original injury and ultimately resulted in plaintiff's surgical procedures.
22. As a direct and proximate result of plaintiff's compensable specific traumatic incident of May 3, 1997, plaintiff was disabled from May 7, 1997, the date when she was determined unable to work, through the date of the hearing before the Deputy Commissioner and continuing.
23. Plaintiff is entitled to have defendant provide all medical treatment necessitated by her May 3, 1997 compensable specific traumatic incident, including all treatment recommended by Dr. Tucci or Dr. Branch. According to Dr. Tucci and Dr. Branch, plaintiff still has some persistent intermittent sciatica related to epidural scar, and some chronic nerve injury or dysfunction that is related to her multiple ruptures and surgeries.
 ***********
Based upon the following foregoing stipulations and findings of fact the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On May 3, 1997, plaintiff sustained a specific traumatic incident of the work assigned resulting in injuries to her back. N.C. Gen. Stat. § 97-2(6).
2. As a direct and proximate result of plaintiff's compensable specific traumatic incident of May 3, 1997, all subsequent and medically documented events were aggravations of this original injury, and ultimately resulted in plaintiff's surgical procedures. Starr v.Charlotte Paper Co., 8 N.C. App. 604, 175 S.E.2d 342 (1970).
3. As a direct and proximate consequence of plaintiff's compensable specific traumatic incident, plaintiff is entitled to temporary total disability compensation at a rate of $512.00 from May 7, 1997, the day plaintiff was found to be unable to work, through the date of the hearing before the Deputy Commissioner and continuing. N.C. Gen. Stat. § 97-29. Although plaintiff was determined to be at maximum medical improvement on September 23, 1999, plaintiff continues to be disabled. Knight v.Wal-Mart, 149 N.C. App. 1, 562 S.E.2d 434 (2002), affirmed, 357 N.C. 44,577 S.E.2d 620 (2003).
4. Plaintiff is entitled to have defendant provide all medical treatment necessitated by the May 3, 1997, compensable specific traumatic incident, including all treatment recommended by Dr. Tucci or Dr. Branch. Additionally, plaintiff is entitled to have the defendant provide her with vocational rehabilitation services in order to assist in her efforts at locating suitable employment. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
 ***********
Based upon the foregoing findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay temporary total disability compensation to plaintiff at a rate of $512.00 per week from May 7, 1997, through the date of the hearing before the Deputy Commissioner and continuing until further order of the Commission. The portion of this award that has accrued shall be paid in lump sum. This award is subject to a reasonable attorney's fee approved in paragraph 2 of this award and to 8 percent interest per year from January 31, 2002 until paid.
2. A reasonable attorney's fee of twenty-five percent (25%) of the compensation due plaintiff under paragraphs 1 of this award is approved for and shall be paid directly to plaintiff's counsel.
3. Defendant shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury so long as it tends to effect a cure and give relief or lessen plaintiff's disability. These medical expenses shall include continuing treatment, including treatment recommended by Dr. Tucci or Dr. Branch.
4. Defendant shall provide plaintiff with vocational rehabilitation services in order to assist plaintiff in her efforts at locating suitable employment.
5. Defendant shall pay the costs.
This 30th day of January 2004.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER