***********
Upon review of the competent evidence of record, with reference to the errors assigned, and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, AFFIRMS the Opinion and Award of the Deputy Commissioner, with some modifications, and enters the following Opinion and Award.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-trial Agreement and at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between the parties at all times relevant to these proceedings.
3. Defendant-Employer had workers' compensation insurance coverage at all times relevant to these proceedings.
4. Plaintiff's average weekly wage was $567.00 at all times relevant to these proceedings, yielding a compensation rate of $378.00.
5. Plaintiff alleges that during the course and scope of her employment she suffered repetitive motion damage to her left elbow since November 9, 2006.
6. The medical index included in Stipulated Exhibit Three (3) reflects Plaintiff's current medical records in this matter.
7. Plaintiff and Defendants reserve the right to obtain independent medical examinations of Plaintiff.
8. Plaintiff has not been working since January 6, 2007, and Defendants have been paying temporary total disability compensation since that time. The parties agree that they will obtain all medical evidence by stipulation or deposition following the hearing before the Deputy Commissioner.
9. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits: *Page 3 
 a. Stipulated Exhibit One (1) — Executed Pre-trial Agreement;
 b. Stipulated Exhibit Two (2) — North Carolina Industrial Commission forms and filings;
 c. Stipulated Exhibit Three (3) — Plaintiff's medical records.
 *********** ISSUES
The issues to be determined are:
1. Whether Plaintiff's psychological condition is causally related to her November 6, 2006 work injury?
2. Whether Plaintiff is entitled to any further workers' compensation benefits for her November 6, 2006 work injury?
3. Whether Plaintiff has any disability from employment as a result of her November 6, 2006 work injury?
4. Whether Plaintiff is at maximum medical improvement with respect to her November 6, 2006 work injury?
 ***********
Based upon the competent and credible evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 52 years old, with a date of birth of February 11, 1958. Plaintiff worked for over 30 years as a dental assistant. Prior to November 6, 2006, Plaintiff received treatment for depression, anxiety, panic attacks, and fibromyalgia for several years but she was able to work full-time as a dental assistant despite these conditions. *Page 4 
2. On November 6, 2006, Plaintiff had an onset of pain and numbness in her left elbow for which she presented to Dr. Robert Alston Barker, her primary care physician, on November 8, 2006. Dr. Barker administered an injection into Plaintiff's left elbow and referred her to Dr. James Stevens Thompson, an orthopaedist. Dr. Barker had previously treated Plaintiff for depression, anxiety, panic attacks, and fibromyalgia.
3. On November 16, 2006, Plaintiff presented to Dr. Thompson with complaints of left elbow pain for the past few months, which she associated with increased use of her left elbow at work. A physical examination revealed marked swelling and tenderness in Plaintiff's left lateral epicondyle, and markedly increased pain with wrist extension and forearm supination. Dr. Thompson diagnosed Plaintiff with progressive left lateral epicondylitis, administered a steroid injection into Plaintiff's left elbow, prescribed some pain medications, and gave her a wrist splint and forearm strap to wear. In addition, Dr. Thompson recommended that Plaintiff modify her work activities in order to obtain support for her left upper extremity.
4. On December 15, 2006, Plaintiff returned to Dr. Thompson, at which time she reported continued left elbow pain and an inability to perform her job duties as a dental assistant for Defendant-Employer. Dr. Thompson noted that, based upon Plaintiff's description of her job duties as a dental assistant, "her work could possibly have contributed to her progressive lateral epicondylitis of the left elbow." However, Dr. Thompson also noted that Plaintiff's history of depression, panic attacks, restless leg syndrome, and chronic pain, combined with the stress associated with her employment with Defendant-Employer, "could also contribute to her symptomatology." Dr. Thompson issued Plaintiff work restrictions for her left upper extremity of no repetitious work, no use of vibrating or pounding tools, and no lifting over one (1) pound. Dr. Thompson was of the opinion that Plaintiff could use her left upper extremity in order to *Page 5 
assist the right upper extremity in performing physical activities.
5. On January 16, 2007, Plaintiff saw Dr. Christopher Lawrence Elder, an orthopaedist, with continued complaints of severe left lateral elbow pain, which sometimes radiated up to her shoulder and down to her fingers, left arm numbness and tingling that radiated down to her fingers, and some swelling at her elbow. Dr. Elder diagnosed Plaintiff with left lateral epicondylitis and noted that she presented with "a lot more pain and diffuse symptoms" than he would normally see with this diagnosis. He attributed the atypical pain and diffuse symptoms to Plaintiff's fibromyalgia. Dr. Elder recommended conservative treatment, including another steroid injection, oral steroids, and physical therapy, but felt that it would take longer for Plaintiff to respond to such treatment.
6. Dr. Elder was of the opinion that Plaintiff could perform light-duty work with restrictions including no lifting more than two (2) to three (3) pounds, no heavy activities, and no gripping or twisting. However, because such light-duty work was not available with Defendant-Employer, Dr. Elder wrote Plaintiff completely out of work "while she recovers." 7. Although Defendants began paying Plaintiff workers' compensation benefits and admitted the compensability of her November 6, 2006 work injury in their Form 33R, response to the request for hearing, they never filed a Form 60 admission of liability.
8. On February 15, 2007, Plaintiff returned to Dr. Elder and reported no improvement, despite the physical therapy and steroid injections. As a result, Dr. Elder ordered magnetic resonance imaging (MRI) of Plaintiff's left elbow and nerve conduction studies in order to rule out carpal tunnel syndrome and cubital tunnel syndrome.
9. Plaintiff's left elbow symptoms persisted, and on March 1, 2007, she also reported to Dr. Elder ecchymosis over the left lateral elbow for the past several days, but denied *Page 6 
any injury or other inciting event that would have caused the ecchymosis, or any previous clotting/bleeding abnormalities. Dr. Elder noted that the left elbow MRI from February 16, 2007 revealed partial tearing of the common extensor tendon with edema in the subcutaneous tissue, and that he had no explanation as to why Plaintiff had ecchymosis over her left lateral elbow. Defendants refused to authorize the nerve conduction studies. Dr. Elder recommended that Plaintiff undergo OssaTron therapy rather than surgery.
10. Defendants requested that Plaintiff undergo a second opinion examination by Dr. Samuel David Jarrett, another orthopaedist in Dr. Elder's practice group. At the March 22, 2007 examination, Dr. Jarrett noted that Plaintiff continued to have ecchymosis over the lateral aspect of her left elbow, and questioned whether she was intentionally bruising herself, which Plaintiff denied. Like Dr. Elder, Dr. Jarrett recommended that Plaintiff undergo OssaTron therapy rather than surgery due to the risks involved with surgery and recovery.
11. Defendants requested that Plaintiff undergo an examination by Dr. Donald Lee Mullis, who is also an orthopaedist in Dr. Elder's practice group. On April 30, 2007, Dr. Mullis diagnosed Plaintiff with chronic left lateral epicondylitis from repetitive work. Based upon Plaintiff's description of her employment duties, Dr. Mullis was of the opinion that her left lateral epicondylitis was an "on job injury." Dr. Mullis recommended that Plaintiff undergo a left lateral epicondylectomy. Plaintiff agreed with Dr. Mullis' recommendation, and wanted him to perform the surgery; however, Defendants refused to pay for the surgery. Dr. Elder agreed that Dr. Mullis' recommendation of surgery was not unreasonable, and that it was ultimately Plaintiff's decision on how to proceed.
12. In September 2007, Defendants authorized the previously ordered nerve conduction studies, which revealed that Plaintiff had mild left carpal tunnel syndrome. Dr. Elder *Page 7 
noted, based upon his review of the nerve conduction studies, that Plaintiff's symptoms were still out of proportion to what he would normally expect, and that he would still be willing to perform the OssaTron therapy, and carpal tunnel release surgery. Defendants were unwilling to authorize the OssaTron therapy due to "insufficient scientific testing" to support its effectiveness. Defendants also wanted another opinion before authorizing the carpal tunnel release surgery.
13. On May 16, 2008, more than a year after Dr. Elder recommended OssaTron therapy and Dr. Mullis recommended surgery for plaintiff's left elbow, Defendants directed that Plaintiff see Dr. James Richard Boatright, an orthopaedist, for another opinion regarding her ongoing left lateral elbow pain and carpal tunnel syndrome. Dr. Boatright noted that Plaintiff "has continued throughout this entire year and a half to have constant pain in the elbow area," with the lateral and posterior aspects of her left elbow being the most severe, and has persistent numbness in her entire left upper extremity. Plaintiff was unable to bear weight on her left upper extremity, unable to sleep on her left side, and unable to use her left hand for almost any activity unless she used the right hand as a support. Dr. Boatright interpreted Plaintiff's April 2008 left elbow MRI as revealing no significant abnormalities, which was a change from the February 16, 2007 left elbow MRI, which revealed "some tendinosis in the lateral epicondylar area." Dr. Boatright's physical examination revealed that Plaintiff continued to have numbness and tingling in her left arm, ecchymosis around the postero-lateral aspect of her left elbow, and diffuse left upper extremity pain. Dr. Boatright felt that Plaintiff's pain was "not substantiated with her physical findings as to a physical cause for most of this."
14. Dr. Boatright recommended against surgery; opined that Plaintiff was at maximum medical improvement "from an orthopedic standpoint," with a zero (0) percent permanent partial disability rating and recommended pain management "that could focus on both *Page 8 
the physical as well as the nonphysical contributors to her overall symptomatology."
15. Plaintiff has not had any medical treatment from a specialist for her left elbow condition since the evaluation with Dr. Boatwright, as Defendants have refused to authorize it.
16. With Defendants' refusal to provide further treatment, along with her continuing inability to return to work, Plaintiff's psychological condition has worsened over time.
17. After the May 16, 2008 evaluation by Dr. Boatright, Plaintiff continued to regularly seek treatment from Dr. Barker for her worsening left upper extremity condition, as well as her fibromyalgia and depression.
18. Ms. Susan Diane Waters, a registered nurse and Plaintiff's case manager assigned by Defendants, from January 2007 through May 2008, testified that Plaintiff had persistent, severe left elbow pain and swelling with a knot on her elbow every time she saw her. Ms. Waters observed that Plaintiff always wore an arm brace and guarded her left arm, and she never saw Plaintiff actively use her left arm. According to Ms. Waters, Plaintiff's condition "definitely" did not improve as of the date of the consultation with Dr. Boatright. Ms. Waters felt that Plaintiff needed to have her pain better managed before she could try to return to work. The Full Commission gives great weight to the testimony of Ms. Waters.
19. On August 26, 2008, Mr. Randy Lee Adams, a long-time vocational rehabilitation professional with extensive experience, evaluated Plaintiff. Mr. Adams opined that Plaintiff's long work history as a dental assistant meant that she was capable of performing highly skilled work, that she liked her work as a dental assistant, and that, but for her November 6, 2006 work injury, she had the desire to continue working as a dental assistant. However, Mr. Adams was also of the opinion that Plaintiff was and continued to be unable to work in any capacity, and that any attempt at job placement for her currently would be futile, based upon the physical work *Page 9 
restrictions placed upon her by her treating health care providers. The Full Commission gives great weight to the opinion testimony of Mr. Adams.
20. On September 9, 2008, Dr. Dennis Hoogerman, a clinical psychologist, evaluated Plaintiff. Dr. Hoogerman performed a battery of objective, standardized testing on Plaintiff, which he interpreted as indicating no evidence of malingering or intentional symptom exaggeration. Dr. Hoogerman diagnosed Plaintiff with a general depressive disorder, panic disorder with agoraphobia, and pain disorder associated with both psychological factors and a general medical condition. The pain from Plaintiff's work injury was exacerbated by her pre-existing psychological condition. Dr. Hoogerman described Plaintiff's pain disorder as a somatoform pain disorder, meaning that she exhibits pain symptoms that are beyond what would be expected from her underlying medical condition without any intention or motivation to deceive.
21. Dr. Hoogerman was of the opinion that there is no way to separate the portion of pain attributable to Plaintiff's left elbow condition related to her work injury from the whole of Plaintiff's somatoform pain disorder (pain disorder), which arises from several factors, including past psychological trauma. Dr. Hoogerman was of the opinion that Plaintiff's pain disorder was not a purely mental issue creating a physical issue, but that it was at least in part related to physical causes. Dr. Hoogerman recommended work hardening, rather than psychotherapy and further opined that Plaintiff is psychologically disabled from any employment at this time.
22. On December 16, 2008, Dr. Terence Edward Fitzgerald, an occupational and clinical psychologist, evaluated Plaintiff. Dr. Fitzgerald diagnosed Plaintiff with an undifferentiated, or functional somatization disorder, meaning that he felt she was converting psychological stress into physical complaints. Dr. Fitzgerald was of the opinion that Plaintiff *Page 10 
exhibited symptom exaggeration, but she was not malingering. Dr. Fitzgerald did not disagree that Plaintiff is experiencing legitimate pain. Dr. Fitzgerald felt that Plaintiff would be a good candidate for short-term, cognitive behavioral counseling in the context of a multi-disciplinary pain management/work-hardening program, and that she "might" be able to return to work in either a medium-duty or light-duty position with reasonable effort and compliance.
23. Dr. Hoogerman disagreed with Dr. Fitzgerald's diagnosis of a functional somatization disorder because he is of the opinion and the Full Commission finds as fact that there is a more equal balance between Plaintiff's physical and psychological problems in their contributions to her left upper extremity pain condition. The Full Commission gives greater weight to the opinion testimony of Dr. Hoogerman than to any contrary opinions of Dr. Fitzgerald.
24. On January 5, 2009, Dr. Barker noted that Plaintiff's severe left elbow pain "has been occurring in a persistent pattern for 2 years," and that her "course has been gradually worsening." In addition, Dr. Barker noted that Plaintiff was still having significant pain, swelling, numbness, and weakness throughout her left upper extremity, which precluded her from most physical activities, including holding books, computer work, and any household work. Dr. Barker prescribed Cymbalta, and recommended a follow up with Dr. Mullis.
25. Dr. Barker opined that Plaintiff's symptoms following her November 6, 2006 work injury "plateaued," but never improved significantly. Dr. Barker further opined that Plaintiff's fibromyalgia seemed to have been worsened by her November 6, 2006 repetitive motion work injury, and he continued to recommend treatment with a specialist such as Dr. Mullis for Plaintiff's left elbow condition. Dr. Barker was of the opinion and the Full Commission finds as fact that Plaintiff remained unable to work in part due to her left upper *Page 11 
extremity condition, and not solely because of her psychological condition or her fibromyalgia. Dr. Barker agreed with Plaintiff being written entirely out of work on a continuing basis.
26. Dr. Boatright was of the opinion that Plaintiff's November 6, 2006 work injury did not aggravate her pre-existing fibromyalgia, but the fibromyalgia had "probably been the set-up factor" for her ongoing pain. Although he deferred to psychological and pain management specialist as to Plaintiff's work status, Dr. Boatright was of the opinion that, based upon the pain symptoms that Plaintiff described, she would need both pain management and psychological counseling before any return to work. Dr. Boatright did not disagree with Dr. Barker's opinion that it was not Plaintiff's fibromyalgia and/or depression alone that were keeping her out of work, but rather, a combination of her fibromyalgia, depression, and left upper extremity condition.
27. The Full Commission gives greater weight to the opinion testimony of Dr. Barker over any contrary opinions of Dr. Boatright. Dr. Barker's opinions are based on the results of his physical examination and treatment of Plaintiff over many years. Dr. Barker's medical records are very detailed, thorough, and demonstrate a strong grasp of Plaintiff's overall physical and mental condition.
28. Plaintiff still has significant, severe pain in her left upper extremity, which she describes as stinging, burning, and horrible. Plaintiff's left upper extremity pain is so severe that she has trouble concentrating because of the pain. In addition, Plaintiff's left arm and hand are weak, and she cannot hold things well in her left hand. The Full Commission finds Plaintiff's testimony concerning the nature and extent of her left upper extremity pain since her November 6, 2006 work injury to be credible.
29. As to Plaintiff's psychological condition and its causal relation to her *Page 12 
compensable left elbow condition, the Full Commission gives more weight to the opinion testimony of Dr. Hoogerman than to that of Dr. Fitzgerald. To the extent that their testimony is contradictory, the Full Commission finds Dr. Hoogerman's evaluation and testimony more convincing, given the greater weight of the other evidence of record.
30. The Full Commission finds, based upon the greater weight of the evidence, that as a result of Plaintiff's work with Defendant-Employer, she sustained an admittedly compensable repetitive motion injury or occupational disease to her left elbow which worsened over time, and contributed to a severe pain disorder affecting other parts of her left upper extremity. Plaintiff's pre-existing, non-disabling, psychological condition exacerbated her pain from the November 6, 2006 work injury and her resulting severe pain which has persisted over a long period of time exacerbated her non-disabling, pre-existing fibromyalgia, depression and anxiety making these conditions worse. The Full Commission further finds that there is no way to apportion the various contributors to Plaintiff's overall pain disorder.
32. Plaintiff needs further treatment with a specialist for her left upper extremity complaints, and would benefit from a psychological evaluation.
33. The Full Commission further finds, based upon the greater weight of the evidence, that since November 20, 2006, Plaintiff has been unable to work as a result of her admittedly compensable left upper extremity work injury (occupational disease), which contributed to a pain disorder affecting other parts of her left upper extremity and as a result of the worsening of her pre-existing fibromyalgia and psychological condition due to her admittedly compensable November 20, 2006 work injury.
32. Plaintiff continues to be written out of work for reasons causally related her November 6, 2006 work injury (occupational disease). *Page 13 
33. Defendants had reasonable grounds to defend this claim.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As a result of Plaintiff's repetitive use of her left upper extremity in her employment with Defendant-Employer, she sustained an admittedly compensable work injury (occupational disease) to her left elbow on November 6, 2006. N.C. Gen. Stat. § 97-53.
2. Plaintiff's pain due to her work injury worsened over time and contributed to a severe pain disorder (somatic pain disorder) affecting other parts of her left upper extremity. Plaintiff's pre-existing, non-disabling, psychological condition exacerbated her pain from the November 6, 2006 work injury and her resulting severe pain which has persisted over a long period of time exacerbated her pre-existing, non-disabling, fibromyalgia, depression and anxiety making these conditions worse. Plaintiff's resulting left upper extremity pain disorder is a direct and natural result of her November 6, 2006 work injury. There is no way to apportion the various contributors to Plaintiff's overall pain disorder.Harrell v. Harriet Henderson Yarns, 314 N.C. 566,336 S.E.2d 47 (1985); Starr v. Charlotte Paper Co.,8 N.C. App. 604, 612, 175 S.E.2d 342, 347 (1970).
3. The treatment Plaintiff has received and continues to be required for her pain disorder is reasonably required to effect a cure, to give relief, and/or to lessen her period of disability. Plaintiff is thus entitled to have Defendants provide her with mental health treatment, including, but not limited to psychological counseling, work hardening, and/or psychiatric treatment for her pain disorder and depression. N.C. Gen. Stat. §§ 97-2(19); 97-25. *Page 14 
4. As a result of Plaintiff's November 6, 2006 work injury, Plaintiff is entitled to have Defendants pay for all medical treatment reasonably related to her work injury. Plaintiff would benefit from pain management, and she is thus entitled to have Defendants provide her with such treatment. N.C. Gen. Stat. §§ 97-2(19); 97-25; 97-25.1 (2008).
5. Plaintiff is not at maximum medical improvement with respect to her November 6, 2006 work injury. Dr. Robert Alston Barker is authorized to provide treatment to Plaintiff for her left upper extremity complaints, fibromyalgia, and depression. Plaintiff is entitled to have Defendants reimburse her for out-of-pocket expenses incurred due to treatment received for her November 6, 2006 work injury with and/or at the direction of Dr. Barker. N.C. Gen. Stat. §§ 97-2(19); 97-25; 97-25.1.
6. Plaintiff remains physically and mentally incapable of work in any employment as a result of her November 6, 2006 work injury as she has been found to be medically unable to work. Thus, Plaintiff is entitled to temporary total disability compensation at the rate of $378.00 per week from November 21, 2006 through the present and continuing until further order of the North Carolina Industrial Commission. N.C. Gen. Stat. § 97-29 (2008); Russell v. Lowes Prod.Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
7. Defendants defended this claim with reasonable grounds. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD *Page 15 
1. Subject to a reasonable attorney's fee herein approved, Defendants shall pay temporary total disability compensation to Plaintiff at the rate of $378.00 per week from November 21, 2006 and continuing until further order of the North Carolina Industrial Commission. Any accrued compensation shall be paid in a lump sum. Defendants are allowed a credit for compensation already paid.
2. Defendants shall pay all medical expenses incurred or to be incurred as a result of Plaintiff's November 6, 2006 work injury, for so long as such evaluations, examinations, and treatments may reasonably be required to effect a cure, to give relief, and/or to lessen her period of disability, in accordance with the provisions of the North Carolina Workers' Compensation Act. Defendants shall reimburse Plaintiff for any and all out-of-pocket medical expenses incurred by her that are related to her November 6, 2006 work injury.
3. Dr. Barker is hereby designated as Plaintiff's authorized treating physician, and Defendants shall authorize and pay for the treatment that he recommends for Plaintiff's November 6, 2006 work injury, including, but not limited to any and all medical and/or psychological treatment which may reasonably be required to effect a cure, to give relief, and/or to lessen her period of disability.
4. A reasonable attorney's fee of 25 percent is hereby approved for Plaintiff's counsel from the sums due Plaintiff under paragraph one (1), above. Defendants shall deduct and pay directly to Plaintiff's counsel 25 percent of the accrued compensation owed to Plaintiff and every fourth (4th) check thereafter.
5. Defendants shall pay the costs of these proceedings.
This the ___ day of February 2010. *Page 16 
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1